480 F.2d 138
 Barbara Ann PIGGOTT, Administratrix of the Estate of Keith
Alexander Piggott, a deceased infant, 9 years of
age, Appellant,
v.
UNITED STATES of America, Appellee.
Barbara Ann PIGGOTT, Administratrix of the Estate of Joyce
Janet Piggott, a deceased infant, 13 years of age, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 72-1822, 72-1823.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1973.
Decided June 18, 1973.
 
 Harry P. Anderson, Jr., Richmond, Va. (Anderson, Haw, Parkerson & Beazley, Richmond, Va., William R. Bland and Stone, Bland & Woods, Williamsburg, Va., on brief), for appellants.
 Robert T. Williams, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.
 Before RUSSELL, FIELD and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 Appellant, administratrix of the estates of her two deceased children, sued the United States under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671 et seq., on the theory that the United States was negligent in operating and maintaining a beach at one of its National Historical Parks. The district court found that the United States was not negligent and entered judgment for the defendant. It is from this finding that appellant seeks relief.
 
 
 2
 * The United States owns and operates Colonial National Historical Park in Virginia. The park has two districts, the Jamestown district, which borders on the James River, and the Yorktown district, which borders on the York River. The deaths of appellant's two children occurred by drowning off a beach called Archer's Hope Landing, which is in the Jamestown district of the park.
 
 
 3
 Archer's Hope is one of three beaches in the Jamestown district which are owned and maintained by the government. There is a paved turn-off area opposite each beach to be used for parking by visitors to the beaches. Trash receptacles are also provided at these beaches and parking areas.
 
 
 4
 Archer's Hope beach has approximately 500 or 600 feet of waterfront. At the time of the drownings, there were two signs, 3.8 feet by 1.2 feet, with 3-inch high letters, on the beach. They were located about 250 feet apart, 125 feet from the parking area, and facing it. The relative positions of the signs, beach, and parking area are clearly shown in the exhibits. The signs read:
 
 
 5
 SWIMMING DANGEROUS STRONG UNDERCURRENT DEEP HOLES
 
 
 6
 Attached to the bottom of each of these signs was another sign which said:
 
 NO FIRES
 
 7
 There was also a larger sign on line with the two smaller ones and about equidistant between them. This sign read:
 
 
 8
 THIS AREA OPEN TO THE PUBLIC USE DURING DAYLIGHT HOURS ONLY. THOSE ON THE BEACH AFTER DARK ARE IN VIOLATION OF PARK SERVICE REGULATIONS (CFR 36-2.6)
 
 
 9
 The referred to section of CFR gives the Superintendent of the Park authority to establish reasonable visiting hours for the park area, as well as the power to close or restrict the public use of any park area when he deems it necessary for the protection of the area or for the safety and welfare of persons or property. He may exercise such authority by posting appropriate signs indicating the extent and scope of such closure.
 
 
 10
 Archer's Hope beach and the other two beaches in the Jamestown district are on a two-mile stretch of the James River on its north bank. Along this two mile stretch, there were a total of eight of the smaller signs mentioned above and four of the larger ones. Other than these signs, the paved parking area opposite each beach, and the trash receptacles, the park provided nothing. No lifeguard, tow line, depth marker, safety line, or other safety equipment was provided at the beaches.
 
 
 11
 The uncontradicted evidence at the trial showed that there was a drop-off approximately 100 to 200 feet out into the river, that there were holes in the river bottom, and that these facts were known by park personnel. The park knew that people of all ages, including small children, used these beaches for picnicking, sunbathing, and swimming. The park records also showed that the deaths of appellant's two children were the sixth and seventh drownings from these beaches since 1960.
 
 
 12
 On Sunday, August 16, 1970, Henry Marsh, a forty-six year old friend of the Piggott and Ashby families, upon the request of one of the Piggott children, picked up the Piggott and Ashby children, thirteen in all, and drove them to the beach. The group first went to Memorial Park Beach, a private beach on the James River. They remained there for a short time and then left. Upon leaving Memorial Park, Marsh drove along the Colonial Parkway[1] until the children asked him to stop at Archer's Hope beach. This was the first time Marsh and the children had been to this area, according to his testimony.
 
 
 13
 Marsh parked in the pull-off area opposite Archer's Hope, and he and the children went down to the beach. There were approximately 100 people there, some on the beach and some in the water. Marsh put a folding chair about twenty-five feet out in the water and told the children not to go beyond him. He further testified that he had not seen any signs when he took the children from the parking area to the beach. After a couple of hours in the water, Marsh took the children back to his pickup truck to eat the lunch which they had brought with them. While the children were eating, Marsh walked over to a nearby car to talk with some friends who had driven into the pull-off area. It was during this brief period of time, about five or ten minutes, that the two Piggott children returned to the water and drowned. Appellant then brought these wrongful death actions against the United States.
 
 
 14
 The cases were tried before the district court, without a jury, on March 22, 1972. On March 23, 1972, the trial court announced its findings of fact and conclusions of law and entered judgment in favor of the United States. The trial court found that the Piggott children were invitees and, therefore, that the United States had a duty to exercise ordinary care in maintaining the premises in a reasonably safe condition. The court found that the conditions at Archer's Hope beach were dangerous and that the United States knew or ought to have known about these dangerous conditions. The court continued and said:
 
 
 15
 "When you take into account the type of area this was, the fact that swimming was permitted, but certainly not encouraged by the Government (and it seems to me that there are, as I indicated by my questions to counsel, countervailing policy considerations that bear on the outcome of the case).
 
 
 16
 "The supervision that would be necessary to insure against this type of accident is not warranted in this type of beach. I do not think there is any requirement here of lifeguards. I do not think there is any requirement here of ropes delineating safe and unsafe areas.
 
 
 17
 "The signs, I find, were adequately worded and adequately placed. They were, moreover, in the area of the general area where these children and Mr. Marsh were.
 
 
 18
 "I do not think that the Government is required to prohibit swimming here by non-swimmers or children as an alternative to providing lifeguards.
 
 
 19
 I think that the policy considerations dictate against that. It would preclude the use of the type of setting that is intended to be had here. It would prohibit the use of many, many people who would enjoy it and do enjoy it in its present condition.
 
 
 20
 "Therefore, I find no negligence on the part of the United States. Therefore, I do not reach the question of contributory negligence." [Emphasis added]
 
 
 21
 Finally, the court said that the children drowned because they went over the drop-off area and that holes or strong currents did not contribute to their deaths.
 
 
 22
 It is the finding that the United States was not negligent from which appellant seeks relief.
 
 II
 
 23
 The cases were instituted under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671 et seq. The district court had jurisdiction to try these cases under 28 U.S.C. Sec. 1346(b).[2] Under these circumstances, the United States is considered to be a private person subject to the law of the place where the incident occurred, which, in these particular cases, would be the law of Virginia. Jennings v. United States, 374 F.2d 983, 985 (4th Cir. 1967); Murray v. United States, 329 F.2d 270, 272 (4th Cir. 1964); Elkins v. United States, 307 F.Supp. 700, 703 (W.D.Va.1969), aff'd. 429 F.2d 297 (4th Cir. 1970). See also United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1962); Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). We must, therefore, determine if the district court's finding that the United States was not negligent was erroneous under Virginia law.III
 
 
 24
 Before turning to Virginia law to determine whether or not the district court applied the proper standard in determining the extent of the duty the United States owed to appellant's deceased children, we think it appropriate to explain the status of the parties. The United States stipulated that the deceased children were invitees,[3] so there may be no argument that they were anything less because they entered the park free of charge. Next, we are of opinion that the fact that the United States knew that people of all ages congregated in considerable numbers and so used Archer's Hope beach for swimming, together with the fact that it erected signs warning of dangerous swimming conditions, but not prohibiting swimming, had the effect of designating Archer's Hope beach as a public swimming area.[4] The fact that the United States did not actively encourage swimming is not controlling. The deceased children were invitees of the park and as such were entitled to use the park facilities, which included the use of any designated swimming area, including Archer's Hope Landing. Thus, the United States was in the same position as any private owner of a beach to which the general public was invited to use for picnicking, sunbathing, and swimming.
 
 
 25
 In Blacka v. James, 205 Va. 646, 139 S.E.2d 47 (1964), the administrator, Edward James, sued the owner, Blacka, of a swimming resort for the wrongful death of Colin K. James. One of the allegations of negligence was that the defendant failed to have an adequate number of properly trained lifeguards on duty at the time of the drowning. The jury returned a verdict for the plaintiff and the defendant appealed. The Supreme Court of Virginia reversed and gave final judgment for the defendant because the plaintiff's evidence, although it showed that the defendant was negligent, failed to show that such negligence was the proximate cause of Colin K. James' death.[5] However, the court addressed itself to the issue of the duty the defendant owed to the deceased boy:
 
 
 26
 "The general rule is that the owner of a swimming pool or lake to which the general public is invited for a consideration must exercise ordinary care for the safety of his patrons. He must make reasonable provisions to guard against those accidents which common knowledge and experience teach are likely to befall those engaged in swimming and other aquatic sports for which he has provided facilities, but the owner is not an insurer of the safety of his patrons." (Citations omitted) 205 Va. at 649, 139 S.E.2d at 50.
 
 
 27
 We believe this statement by the Virginia Supreme Court sets out the duty owed in Virginia to an invitee by the owner of a public beach. We are unable to find any Virginia case which would lessen the owner's duty to his invitee because of the esthetic aspects of the beach or because of other policy considerations. For these reasons, we are of opinion that the district court applied an erroneous standard when it included policy (and perhaps esthetic) considerations in its determination that the United States was not negligent in performing the duty it owed appellant's two deceased children.
 
 
 28
 The United States relies on the case of Washabaugh v. Northern Virginia Construction Co., 187 Va. 767, 48 S.E.2d 276 (1948), to support its contention that it was not guilty of negligence in the instant cases. In Washabaugh, the Virginia Supreme Court recited that the attractive nuisance doctrine had been repudiated in Virginia. The court continued and held that the defendant was not liable for the drowning of plaintiff's child in its rock quarry because such a dangerous condition was open, obvious, natural, and common to all. We think Washabaugh is inapposite here because it dealt with the duty a land owner owes to a trespassing child, not with the duty owed an invitee, as in Blacka.
 
 
 29
 Accordingly, we must remand these cases to the district court for a new trial so that it may determine the issue of negligence under the standards set out in Blacka, supra, and the footnote below.[6] Should the district court find that the United States was negligent, then it must decide whether or not such negligence was the proximate cause of the death of appellant's children. If it finds that such negligence was the proximate cause of the children's death, it must further resolve the issue of contributory negligence raised by the United States.[7]
 
 
 30
 Reversed and remanded for a new trial.
 
 
 
 [1]
 The Parkway is part of the Colonial National Historical Park. It is the main drive through the park and runs from Jamestown through Williamsburg to Yorktown
 
 
 [2]
 This section gives the district courts exclusive jurisdiction to try civil actions against the United States where ". . . personal injury or death [is] caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." [Emphasis added] 28 U.S.C. Sec. 1346(b)
 
 
 [3]
 For a definition of invitee under Virginia law, see City of Richmond v. Grizzard, 205 Va. 298, 302, 136 S.E.2d 827, 830 (1964); Richmond Bridge Corporation v. Priddy, 167 Va. 114, 187 S.E. 518 (1936). See also, Note: Invitee Status in Virginia, 44 Va.L.Rev. 804 (1958)
 
 
 [4]
 CFR 36-Sec. 2.28(a) provides:
 "(a) Swimming and bathing are permitted except in waters and at times where such activities are prohibited in the interest of public health or safety, which excepted waters shall be designated by posted signs."
 
 
 [5]
 The evidence showed that when the boy was last seen, he was not in distress and was swimming normally. 205 Va. 650, 139 S.E.2d 51
 
 
 [6]
 We note that in Virginia the duty an owner of realty owes to an invitee is to "use ordinary care to render the premises reasonably safe for the invitee's visit." Knight v. Moore, 179 Va. 139, 18 S.E.2d 266, 269 (1942). However, such an owner may, in proper circumstances, relieve himself from liability for injuries to an invitee by providing an effective and adequate warning of any dangerous conditions of which he has knowledge and the invitee does not. Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664 (1951)
 While it is true that Virginia has held that the danger of drowning in a natural body of water is an open and obvious one, Washabaugh, supra, the district court, upon remand, should determine as a matter of fact whether or not failure to provide lifeguards and other safety devices constituted a dangerous condition which required the giving of an adequate warning. If such warning was not given, the court should determine whether the condition was so "open and obvious that it should have been seen or observed by a person in the exercise of ordinary care for his own safety," which may have made such warning unnecessary. Knight, supra, 18 S.E.2d at 270. See also Rich mond Bridge Corporation v. Priddy, supra; City of Richmond v. Grizzard, supra.
 We express no view as to whether or not the United States was guilty of negligence in the instant cases.
 
 
 [7]
 Even if we decided that the United States were negligent, instead of remanding that issue to the district court, we would still have to remand the cases to the district court for decision on the issues of proximate cause and contributory negligence